UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| A.N.P.S., minor, by and through Next Friend of Kin, N.C.S.E., | |
| Petitioner, | Case No. 25-cv-14778 |
| v. | Judge Mary M. Rowland |
| Angie SALAZAR, in her official capacity as Acting Director of the Office of Refugee Resettlement (ORR), Andrew GRADISON, in his official capacity as Acting Assistant Secretary for the Administration for Children and Families (ACF), Robert F. KENNEDY JR., in his official capacity as Secretary of the Department of Health and Human Services (HHS), Luis CASTRO, in his official capacity as Federal Field Specialist, Office of Refugee Resettlement, Antonio GONZALEZ, in his official capacity as the Federal Field Specialist Supervisor, Office of Refugee Resettlement, LaVerne MUIR WRAY in her official capacity as Director of Heartland Int. Children's RC, | |
| Respondents. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Petitioner A.N.S.P.'s petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. For the following reasons, the Court grants the petition [1]. Within 48 hours of this order, the parties are to identify a time and place at which N.C.S.E. can retrieve Petitioner into her custody. Within 7 days of this order, the

1

parties are to file a joint status report indicating that Petitioner has been released to N.C.S.E.'s custody.

## BACKGROUND

### I. Factual Background

Petitioner is a minor child and a native and citizen of Honduras. [1] ¶¶ 1, 10. Petitioner entered the United States on October 15, 2022, was designated an unaccompanied minor, and was placed in the custody of the Office of Refugee Resettlement ("ORR"). [1] ¶ 18. After Petitioner entered the country, on or about December 6, 2022, ORR released him to the custody of his adult cousin, N.C.S.E., who resided in Illinois. [1] at 18. ORR's internal documents reflect that it released Petitioner to N.C.S.E. *"pursuant to section 462 of the Homeland Security Act ['HSA,' codified at 6 U.S.C. § 279] and section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ['TVPRA,' codified in relevant part at 8 U.S.C. § 1232]."* [15-2] at 1 [emphasis added].

Petitioner was *re-arrested* by U.S. Immigration and Customs Enforcement ("ICE") on November 7, 2025, and has been detained by Respondents since the date of his arrest. [1] ¶¶ 1, 10.

On November 14, 2025, Petitioner's counsel filed a petition for Guardianship with the Cook County Probate Court, and on November 20, 2025, the Cook County Probate Court appointed N.C.S.E. (Petitioner's cousin, and the adult to whom ORR released Petitioner in 2022) as Petitioner's legal guardian. [15] ¶ 4. The order further appointed N.C.S.E. as Petitioner's guardian *nunc pro tunc* to February 1, 2023, the

2

date that Petitioner's mother signed and notarized a transfer of custody to N.C.S.E.[1] [15] ¶ 4.

Petitioner filed his habeas petition on December 5, 2025. It includes four claims for relief: Count I is a claim for a violation of the Due Process Clause of the Fifth Amendment, alleging violations of both substantive and procedural due process; Count II alleges that Respondents violated the Administrative Procedures Act ("APA") by acting arbitrarily and capriciously; Count III alleges that Respondents violated 6 U.S.C. § 279 of the HSA; Count IV alleges that Respondents violated the *Accardi* doctrine, which provides that government agencies are bound to follow their own rules.

## II.     Legal Framework

In 2002, Congress passed the HSA, which among other things conferred responsibility for the care and placement of unaccompanied alien children ("UACs") with ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2). Six years later, Congress passed the TVPRA "to enhance the efforts of the United States to prevent trafficking" and provide additional protections for children who are present in the United States without legal status. 8 U.S.C. § 1232(a)(1).

The HSA defines a UAC as one who:

(A) has no lawful immigration status in the United States;
(B) has not attained 18 years of age; and
(C) with respect to whom--
    (i) there is no parent or legal guardian in the United States; or
    (ii) no parent or legal guardian in the United States is available to provide care and physical custody.

---

[1] The record reflects that on February 1, 2023, Petitioner's mother signed and notarized a document in her home country to a transfer of custody of Petitioner to his cousin, N.C.S.E. [1] ¶ 18.

3

6 U.S.C. § 279(g)(2). A "legal guardian" is "an individual who has been lawfully vested with the power, and charged with the duty of caring for, including managing the property, rights, and affairs of, a child or incapacitated adult by a court of competent jurisdiction, whether foreign or domestic." 45 C.F.R. § 410.1001.

Under both statutes, once a UAC is taken into custody by a federal agency, the agency is to transfer the UAC to ORR's custody within 72 hours. 8 U.S.C. 1232(b). The TVPRA requires that ORR place the UAC "in the least restrictive setting that is in the best interest of the child," considering, among other things, whether the minor is dangerous or presents a flight risk. 8 U.S.C. § 1232(c)(2)(A). Once a minor is in ORR custody, removal proceedings typically begin before an immigration judge to decide whether the minor should be removed from the country. *See* 8 U.S.C. § 1232(a)(5)(D).

A UAC need not remain in ORR custody while he waits for his removal proceedings to conclude. ORR may release a UAC to a "sponsor" or "custodian" after determining that the sponsor "is capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A). The TVPRA requires that before making such a determination, ORR must verify "the custodian's identity and relationship to the child, if any, as well as [make] an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." *Id*. Pursuant to 8 U.S.C. § 1232(c)(2)(A), a UAC can also only be placed with a sponsor upon a finding that the UAC does not present a danger to himself or his community or a flight risk.

4

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule ("Foundational Rule," codified at 45 C.F.R. Part 410) to further fortify and enhance protections for UACs. The Foundational Rule continues to obligate ORR to place UACs in the least restrictive setting that is in the best interest of the child. 45 C.F.R. § 410.1103(a). The Foundational Rule also established a more formalized process through which ORR determines if a potential sponsor is suitable. Specifically, potential sponsors are required to complete an "application package," which must contain proof of address, proof of income, sponsor-child relationship, and criminal history documents. 45 C.F.R. § 410.1202(a); ORR UACB Policy Guide ("UAC Policy Guide"), §§ 2.2.4-5, *available at* https://acf.gov/orr/policy-guidance/unaccompanied-children-bureau-policy-guide. Further, each adult living in the home of the potential sponsor must submit to a background check, and in some cases, home-studies. UAC Policy Guide §§ 2.2.5. Potential sponsors claiming to be biologically related to the UAC must also submit DNA testing confirming the relationship. [17-1] ¶ 28.

The Foundational Rule requires ORR to adjudicate completed sponsorship applications of close relatives—including first cousins—within 14 days, unless there is an unexpected delay, "such as a case that requires completion of a home study." 45 C.F.R. § 410.1205(b). ORR may require a home study under several circumstances, including where "in its discretion . . . it determines that a home study is likely to provide additional information which could assist in determining that the potential sponsor is able to care for the health, safety, and well-being of the unaccompanied

5

child." 45 C.F.R. §410.1204(c). To the extent the Court is aware, outside of a case where a home study is required, no regulation defines or limits the contours of what may constitute an unexpected delay.

The Foundational Rule requires that all individuals—even a UAC's parent or legal guardian—must go through the sponsorship application process before obtaining custody of a child held by ORR. *See* 8 U.S.C. § 1232(c)(3)(A); 45 C.F.R. § 410.1201(a), 1202(b).

## ANALYSIS

### I. Overview

It has now been over a month since Petitioner was detained and taken away from the custody of his family member. In the interest of providing a prompt resolution, the Court does not address every argument the parties raise and instead considers only those necessary to provide a resolution. The Court notes, however, that the issue presented by the petition — under what circumstances a UAC previously-released to a sponsor, re-detained without probable cause shall be released from ORR custody — has only been litigated once previously. *See Saravia v. Sessions*, 280 F. Supp. 3d 1168 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

### II. Based on the record before the Court, Petitioner was a UAC at the time of his re-detainment.

Initially, Petitioner argues that his re-arrest on November 7, 2025 was unlawful because he was not a UAC on that date. Petitioner reasons that (1) the HSA only contemplates detention of UACs, (2) a UAC is defined as one who does not have a

6

parent or legal guardian in the United States, and (3) N.C.S.E. was his legal guardian on that date and was present in the United States.

The problem with this argument is that there is no evidence in the record upon which the Court could find that N.C.S.E. *was* Petitioner's guardian at the time of his recent arrest. A legal guardian is one who "has been lawfully vested with the power, and charged with the duty of caring for, including managing the property, rights, and affairs of, a child or incapacitated adult **by a court** of competent jurisdiction, whether foreign or domestic." 45 C.F.R. § 410.1001 (emphasis added). Petitioner appears to rely on his mother's notarized conferral of custody to N.C.S.E. on February 1, 2023 as being sufficient to render N.C.S.E. Petitioner's legal guardian. *See* [18] at 2 (arguing that ". . . the foreign jurisdiction of Honduras vested N.C.S.E. with the power and charged her with the duty of caring for Petitioner."). In support, Petitioner refers to a short document titled "Full Custody Authorization and Power of Attorney," [15-1], where Petitioner's mother purportedly "grant[ed] full custody" to N.C.S.E. But it is not clear what legal effect this document carries; nothing in the document establishes that custody of Petitioner was vested in N.C.S.E. *by a court*, as is required by the statutory scheme to render N.C.S.E. Petitioner's legal guardian. Rather, it appears to be what its title implies: a grant of *authority* to transfer custody from Petitioner's mother to N.C.S.E., rather than a court-approved grant of *custody*.[2] The February 1,

---

[2] The Cook County Probate Court's order supports this reading: it indicates that on February 1, 2023, Petitioner's mother "*consented* to the appointment" of N.C.S.E.'s legal guardianship. [15-3] at 1 (emphasis added).

7

2023 custody conferral, then, is immaterial to the question of whether Petitioner was a UAC at the time he was re-detained in November 2025.

Petitioner also relies on the Cook County Probate Court's November 20, 2025 order (the "Custody Order" or "Order") appointing N.C.S.E. as Petitioner's legal guardian *nunc pro tunc* to February 1, 2023. But under both federal and Illinois law, a court may properly issue *nunc pro tunc* orders to correct clerical errors; such orders may *not* be used to rewrite history or supply some previously omitted judicial action. *Cent. Laborers' Pension, Welfare & Annuity Funds v. Griffee*, 198 F.3d 642, 644 (7th Cir. 1999); *Beck v. Stepp*, 579 N.E.2d 824, 827 (Ill. 1991).

Further, it is not clear to the Court that the Custody Order has any legal effect on Petitioner's claim here. As a threshold matter, the Court notes although Petitioner filed a copy of the Order with the Court, [15-3], nothing on the face of the document indicates what the probate court intended the effect of its *nunc pro tunc* application to mean. Regardless, prior to Petitioner's November 7, 2025 arrest, N.C.S.E. was not Petitioner's legal guardian. Petitioner was thus a UAC at the time of his second arrest and detainment as the term is defined in the relevant statutory and regulatory scheme.

What is clear, however, is that N.C.S.E. was Petitioner's *sponsor* as approved by ORR at the time of his arrest.

### III. Petitioner's Re-Detention Nonetheless Violated His Procedural Due Process Rights.

Petitioner can secure relief on his habeas petition if he can establish that his detention violates his procedural due process rights. *See Garcia Diaz v. Acuff*, 507 F.

8

Supp. 3d 991, 997 (S.D. Ill. 2020). To determine what due process requires, courts consider: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Although the law that recognizes minors, unlike adults, "are always in some form of custody," minors nonetheless "retain a strong interest in being free from unnecessary government interference with their liberty." *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1195 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018) (citing *Schall v. Martin*, 467 U.S. 253, 265 (1984)). And "[a]liens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982). The question is whether the government violated Petitioner's procedural due process rights when they re-arrested and detained Petitioner after previously releasing him *pursuant to the requirements* of the HSA and TVPRA.

Here, the Court finds that Petitioner has a liberty interest in freedom from detention, and that the government violated that interest when it re-detained Petitioner without a change in circumstances. The government ignores the longstanding principle recognized in both federal and state law that "where one has been released on bail he cannot be rearrested in the same jurisdiction on the same charge on which he was originally arrested." *Williams v. Dart*, 967 F.3d 625, 635 (quoting *United States ex rel. Heikkinen v. Gordon*, 190 F.2d 16, 19 (8th Cir. 1951)); *McGilvery v. Morehead,* 2 Cal. 607, 609 (1852) ("When a party is once arrested and discharged, he cannot be arrested again in the same action . . . [because a] different rule might . . . lead to harassing arrests."). This same principle has been applied to illegal aliens who are released on bail and subsequently re-arrested. *See Carlson v. Landon*, 342 U.S. 524, 546 (1952) (reversing denial of habeas corpus to detainee released on bail then re-arrested under original warrant); *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969-70 (N.D. Cal. 2019) (holding that noncitizen habeas petitioner's due process rights were violated after he was released on bond and subsequently rearrested without a demonstration that circumstances had changed); *Jorge M.F. v. Jennings*, 534 F. Supp. 3d 1050, 1058 (N.D. Cal. 2021) (granting preliminary injunction on procedural due process claim and ordering that the government could only re-detain a noncitizen previously released on bond after providing the noncitizen with notice and hearing). Indeed, the same rules apply to *accompanied* minor noncitizens as well. An accompanied minor may be released on bond or parole only after it is determined that he is not dangerous or a flight risk, *see In re Guerra*, 24 I.

& N. Dec. 37, 38 (B.I.A. 2006)[3], and that a finding that *can only be disturbed* upon a showing of some change in circumstances. *In re Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981). The Court is dumbfounded that the government did not address this issue—the fact that Petitioner was previously released by ORR to N.C.S.E. It is at the heart of the case.

In *Saravia v. Sessions*, the district court held that the same due process protections extended to UACs who had previously been released to a sponsor and were subsequently re-detained. 280 F. Supp. 3d 1168 at 1196. There, like here, minor noncitizen plaintiffs who had previously been held in ORR custody and previously released to a suitable sponsor brought a habeas petition[4] after DHS subsequently re-arrested and re-transferred them to ORR custody. *Id* at 1177.[5] *Because ORR had previously released the plaintiffs to a sponsor,* the court reasoned, ORR must have necessarily determined that each plaintiff was not a danger to himself, his community or a flight risk. *Id*. at 1196 (citing 8 U.S.C. § 1232(c)(2)(A) (requiring that ORR consider such factors before placing a UAC)). The court thus held that to re-detain the plaintiffs absent some showing that the circumstances surrounding the plaintiffs' dangerousness or flight risk had changed was a violation of their due process rights. *Id*. at 1196-97.

---

[3] *Guerra* was subsequently abrogated by the First Circuit's decision in *Hernandez-Lara v. Lyons*, but only insofar as *Hernandez-Lara* makes clear that it is the *government* who bears the burden of demonstrating that a noncitizen detainee presents a danger to the community or is a flight risk. 10 F. 4th 19, 39 (1st Cir. 2021).
[4] The *Saravia* plaintiffs also brought a motion for preliminary injunction and motion to certify a class.
[5] The *Saravia* plaintiffs were re-arrested based on allegations of gang activity. 280 F. Supp.3d at 1177. Here, no reason for Petitioner's re-arrest has been offered.

11

The same easily follows here. With respect to adult noncitizens, accompanied minor noncitizens, and adult criminal defendants, once the government has released a detainee upon a finding that he is not a danger to himself or his community and does not present a flight risk, due process prevents the government from subsequently changing its mind on a whim and re-arresting the detainee. There is no reason why due process would not provide the same protections for Petitioner. Indeed, a UAC's due process rights are *at least* as strong as a noncitizen minor whose parent or legal guardian is in this country. *Saravia*, 280 F. Supp. 3d at 1197.

Turning back to *Mathews v. Eldridge* balancing test, the Court finds that Respondents violated Petitioner's due process rights when they re-arrested and re-detained him after having previously released him upon finding that he presented no risk of danger or flight. His interest in freedom from imprisonment is well established, and there is clearly a severe risk of erroneous deprivation here: Respondents previously determined that it was appropriate to release Petitioner to N.C.S.E., and with no justification (or even explanation) they subsequently re-arrested and re-detained Petitioner. And the government's interest is slight insofar as it previously determined that Petitioner could be safely released to N.C.S.E. and have provided no reason to think he could not be safely restored to N.C.S.E.'s custody.

**IV.    Respondents' Arguments Do Not Compel A Different Outcome**

Respondents raise a handful of interrelated arguments in response that fail for interrelated reasons. Initially, Respondents argue that Petitioner's habeas claim is premature because Petitioner has not exhausted his administrative remedies. [17] at

12

10 (citing *Richmond v. Scibana*, 387 F.3d 602, 604 (7th Cir. 2004) (discussing the "common-law exhaustion rule [that] applies to § 2241 actions"); *Baker v. Warden*, No. 23 C 50028, 2025 WL 1398979, at *3 (N.D. Ill. May 14, 2025) (petitioners "must exhaust their federal administrative remedies before seeking habeas relief in court")).

Specifically, Respondents argue Petitioner has not exhausted his administrative remedies because N.C.S.E. has not submitted a sponsorship application with ORR, which Respondents maintain is necessary for N.C.S.E. to re-obtain custody of Petitioner. [17] at 10. But again, *ORR already released Petitioner into N.C.S.E.'s custody over three years ago.* That is, N.C.S.E already sought **and received** the administrative relief that Respondents now want her to seek following their unexplained re-detention of Petitioner. By releasing Petitioner to N.C.S.E. in 2022, ORR was *required* to find that placing Petitioner in N.C.S.E.'s custody was "in the best interest of" Petitioner and that Petitioner's release did not present a danger or a flight risk. 8 U.S.C. § 1232(c)(2)(A). In making that finding, ORR necessarily had to find that N.C.S.E. was "capable of providing for [Petitioner's] physical and mental wellbeing," and ORR was required to "at a minimum" verify N.C.S.E's identity, relationship to Petitioner, and verify that N.C.S.E. did not engage in any activity that could place Petitioner at risk. 8 U.S.C. § 1232(c)(3)(A).

Respondents' position is that because they chose to arrest and re-detain Petitioner (without any explanation as to why), N.C.S.E. must go through the process again. The Court does not agree and declines in its discretion to require Petitioner to exhaust any administrative remedies.

13

Related to their exhaustion argument, Respondents also contend that they cannot release Petitioner because the statutory framework of the HSA and TVPRA *require* them to hold Petitioner until a suitable sponsor has been found. Here, the Court has good news: Respondents *already identified* N.C.S.E. as a suitable sponsor for Petitioner. As just explained, when ORR released Petitioner to N.C.S.E. in 2022, it specifically said that it did so pursuant to requirements of the HSA and TVPRA.[6] [15-2] at 1. To the extent that Respondents believe that either statute gives them the right (or indeed the obligation) to re-detain and hold indefinitely a previously-released UAC to a previously-approved sponsor without any change in circumstances, Respondents are wrong. As the Court explained *supra*, Petitioner's arrest and re-detainment violated his due process rights, and neither Congress nor any administrative agency can authorize a violation of due process rights. *United States v. Villamonte-Marquez*, 462 U.S. 579, 585 (1983). Respondents thus cannot wield any provision of the HSA, TVPRA, or any agency-promulgated regulation in violation of those rights.

---

[6] The Court is aware that in April 2024 (and thus after Petitioner was first released to N.C.S.E. in 2022), ORR promulgated the Foundational Rule, which Respondents describe as "formaliz[ing] previously informal procedures, including those related to ORR's release policies and practices." [17] at 3-4. The Foundational Rule's effect was meant to enhance the screening process used to approve sponsors. That is laudable. And there is nothing in the text of the Foundational Rule to suggest that it rendered invalid previous findings of sponsor suitability. Respondents' implied position may be that every UAC released to sponsors prior to April 2024 is subject to re-arrest and re-detention. Regulations are to be interpreted to avoid absurd results, *U.S. v. Turkette*, 452 U.S. 576, 580 (1981), and the Foundational Rule was promulgated to *protect* UACs. *See generally* 89 FR 34384-01. An application of the Rule that would permit the Government to re-arrest the thousands of UACs placed with a sponsor prior to April 2024, taking them away from their family and community, would be the definition of absurd. *See* Unaccompanied Alien Children Released to Sponsors by State, Office of Refugee Resettlement, *available at* https://acf.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state (containing data showing that approximately 100,000 UACs were released to sponsors every year from 2021 – 2024).

14

To illustrate the problem with Respondents' argument it is helpful to distill its implications. In Respondents' view, the government may arrest, detain, and transfer to ORR any UAC in the nation today who has previously been released to an approved sponsor. To obtain relief, the relevant statutes require that sponsor to again go through the sponsorship application process and wait for ORR to approve the UAC's release. But because appointing a sponsor does not make them a legal guardian, a minor released to an approved sponsor is *still* a UAC. Accordingly, in Respondents' view, the government may then re-arrest, re-detain, and re-transfer the minor to ORR, at which point the sponsor would have to begin the process all over again. And once that process is completed, there is nothing to stop Respondents from arresting the UAC *again* and starting the process over. The Due Process Clause does not permit the government to subject persons in the United States to this kind of procedural house of mirrors, where one can only secure illusory freedom from custody, and any freedom is constantly subject to the impermanent whims of the government. No nation of laws would operate in such a manner.

Finally, Respondents argue that UACs like Petitioner cannot state a procedural due process claim at all, *regardless* of the *Mathews* balancing test. [17] at 14. Respondents rely on the Supreme Court's decision in *Reno v. Flores*. But *Flores* does not bear the weight Respondents place on it. There, the Supreme Court considered a facial challenge to a regulation promulgated by the now-defunct INS that limited the circumstances under which a UAC could be placed in the custody of a non-relative adult where there was no parent, legal guardian, or "close relative" available. 507

15

U.S. 292 at 296-98 (1993). If the INS was unable locate a suitable adult to take custody of a UAC, the regulation required the INS to place the UAC in a "suitable . . . facility designed for the occupancy of juveniles." *Id.* at 297. Relevant to the issues before the Court now, the *Flores* plaintiffs challenged the regulation on the basis that it violated procedural due process. *Id.* at 299-300.[7] Specifically, plaintiffs in *Flores* urged that procedural due process required that UACs for whom "no available parent, close relative, or legal guardian" was available be afforded "the right to an individualized hearing" on what kind of placement was in the child's "best interests." *Id.* at 303-04. The Supreme Court rejected that argument, reasoning that just as the constitution does not require that a child be given the best schooling or the best health care available, it also does not require that a child be placed in the best custody or housing available. *Id.* at 303-05.

*Flores*, then, concerns UACs who are (1) detained for the first time and (2) do not have a readily available parent, close relative, or legal guardian to take custody of them. Here, of course, Petitioner is challenging his *second* detention, importantly not based on probable cause, and seeks to be released to a close relative, importantly a person already approved by the government to be a sponsor.[8] *Flores* thus says little if anything about what procedural due process someone in Petitioner's circumstances

---

[7] The *Flores* plaintiffs also challenged the regulation on the basis that it violated substantive due process, but the Court does not address *Flores*'s holdings there because the Court does not reach Petitioner's substantive due process claim.

[8] Respondents contend that Petitioner here seeks placement with someone other than a parent or close relative. [17] at 13. Respondents are wrong. The relevant regulations define a first cousin as a "close relative." 45 C.F.R. § 410.1001.

16

must be afforded, and it certainly does not hold that a UAC may not obtain due process under the *Mathews* test, as Respondents appear to argue.

For these reasons, the Court holds that Respondents violated Petitioner's procedural due process rights when they re-arrested and re-detained him on November 7, 2025 without some showing of a change in circumstances. ORR previously released Petitioner after finding that he did not present a danger to himself or to his community, and that he presented no flight risk. ORR previously released him to a suitable sponsor who they found was sufficiently capable of providing for his wellbeing. Procedural due process precludes Respondents from simply changing their mind with no reason, explanation, or notice.

### V.     Scope of Relief

Petitioner requests as relief his immediate release. That request has credence. "It is well-settled that a district court can order a petitioner's release. This, in fact, is the very essence of habeas relief." *Phifer v. Warden, U.S. Penitentiary, Terre Haute, Ind.*, 53 F.3d 859, 864 (7th Cir. 1995). In *Saravia*, rather than granting immediate release, the court required that the respondents provide the re-detained UACs a hearing before an immigration judge where plaintiffs and their previously-approved sponsors had notice and opportunity to respond to the respondents' allegations of gang involvement. 280 F. Supp.3d at 1205-06. But unlike *Saravia*, here there has been no suggestion that Petitioner or his sponsor engaged in any conduct that would challenge ORR's previous findings regarding Petitioner's suitability for release and N.C.S.E.'s suitability to maintain custody over him.

17

Accordingly, the Court here finds it is appropriate to order Petitioner's immediate release. The Court is aware, however, that because Petitioner is a minor, ORR cannot simply release him on his own recognizance. 6 U.S.C. § 279(b)(2)(B). Within 48 hours of this order, the parties are to identify a time and place at which N.C.S.E. can retrieve Petitioner into her custody. Within 7 days of this order, the parties are to file a joint status report indicating that Petitioner has been released to N.C.S.E.'s custody.

## VI. Conclusion

For the foregoing reasons, the Court grant's Petitioner's petition for writ of habeas corpus [1]. Within 48 hours of this order, the parties are to identify a time and place at which N.C.S.E. can retrieve Petitioner into her custody. Within 7 days of this order, the parties are to file a joint status report indicating that Petitioner has been released to N.C.S.E.'s custody.

E N T E R:

Dated: December 22, 2025

*Mary M Rowland*